**Candace VAN ALEN,**
**Plaintiff-Appellant-Cross-Appellee,**

v.

**DOMINICK & DOMINICK, INC., and**
**Paul deGive,**
**Defendants-Appellees-Cross-Appellants.**

**Nos. 1321, 1322, Dockets 77–7103, 77–7115.**

United States Court of Appeals,
Second Circuit.

Argued June 15, 1977.

Decided Aug. 15, 1977.

---

Charles Norman Shaffer, Rockville, Md. (Jerome Kamerman, Philip A. Greenberg, David S. Zeidman, New York City, Shaffer & Davis, Rockville, Md., of counsel), for plaintiff-appellant-cross-appellee.

Jeffrey A. Barist, New York City (Vincent R. FitzPatrick, Jr., Benjamin S. Bilus, White & Case, New York City, of counsel), for defendants-appellees-cross-appellants.

Before SMITH and OAKES, Circuit Judges, and BRYAN, District Judge.[*]

OAKES, Circuit Judge:

"Churning" by a securities broker consists of causing excessive turnover in a customer's account for the purpose of increasing the broker's commissions.[1] Appellant's basic claim below was that her broker engaged in churning during the bear market of 1969–70, causing her trading losses of just under $600,000. Her complaint alleged violations of Securities and Exchange Commission Rule 10b–5 and of New York Stock Exchange (NYSE) rules and further alleged common law fraud. The United States District Court for the Southern District of New York, Lawrence W. Pierce, Judge, however, credited the testimony of the broker, deGive, to the effect that he, as a "chartist," was in good faith following a "technical system" in the handling of appellant's account—as he had done with her evident approval and to her considerable profit over the preceding 16 years. The court held that (1) there was no violation of Rule 10b–5 in that (a) the turnover in appellant's accounts was not excessive, (b) appellant was estopped by her acceptance of past benefits from the broker's "system," (c) no scheme or artifice to defraud was shown, and (d) there was no scienter; (2) no common law fraud was established, since the essential elements of material misrepresentation, scienter, reliance, and causation were missing; and (3) no claim for relief for violation of the NYSE rules requiring, inter alia, due diligence on the part of brokers and supervision by the brokerage firm had been stated, because (a) such a claim must be based on fraud, not proven here, in order to be actionable, or (b) even if fraud need not be proved, no causal connection had been established between the alleged NYSE rules violations and the losses sustained.

On this appeal appellant argues that the court below erred in making certain material findings of fact, in refusing to allow cross-examination of appellee deGive on several "diary entries," and in dismissing before trial the count of the complaint alleging violations of NYSE rules. Appellees have filed a cross-appeal from the district court's denial of their application for attorneys' fees. We affirm on both the appeal and the cross-appeal.

### Facts

Appellant Van Alen, a college graduate married to a well-to-do investor, first gave appellee deGive, a market analyst and newsletter-writer associated with appellee Dominick & Dominick (Dominick), discretionary control over a $125,000 bank custody account in 1953, indicating that she was interested in growth as well as security. Appellant also asked deGive to treat the account as if it belonged to a member of his own family. An account at Dominick was opened for appellant, and it was understood that the bank and Dominick accounts would be run in accordance with NYSE rules and regulations.

deGive ran these accounts, as appellant knew, by following his technical system, calculating buying and selling pressures with graphs based on a series of "moving averages" covering 7, 10, 12, 18 and 30 day cycles. The graphs were drawn from the price action and volume of certain individual stocks, the Dow Jones Industrial Average, and other averages. By dividing the number of issues advancing by those traded (in the particular average), he would obtain a "buying" indicator; doing the same thing with the issues declining would give him a "selling" indicator. The percentage ratios calculated each day for each cycle would be added to previous ratios and the total divided by the number of days in the cycle. All of this was plotted on graphs or charts and from these deGive would derive overall

---

[*] Of the Southern District of New York, sitting by designation.

1. See note, *Churning by Securities Dealers,* 80 Harv.L.Rev. 869, 869 (1967). For cases involv-ing churning, *see, e.g., Carras v. Burns,* 516 F.2d 251, 257–58 (4th Cir. 1976); *Stevens v. Abbott, Proctor & Paine,* 288 F.Supp. 836 (E.D. Va.1968) (Merhige, J.).

"buy" or "sell" signals, the concurrence of a certain percentage indicating "major moves."

The system, based primarily on market psychology rather than individual company performance, was highly successful over a period of time. Appellant from time to time took out bank loans to purchase additional stock, and, at the start of the period in question in this case, February 1, 1969, her accounts stood at over $1.6 million, having increased in excess of $550,000 in 1967 alone. The court credited testimony below that deGive's investment policies in respect to appellant's accounts were consistent with and parallel to the advice that he gave in his market newsletter and the investments that he made for his wife's account.

Between February 11 and 14, 1969, de-Give bought for appellant's accounts 27 stocks valued at $700,889, and between February 18 and 20 he sold almost all of them, each at a loss. Again between April 30 and May 5 he bought 40 stocks valued in excess of $1.3 million and sold them all on May 26 and 27. Despite these rapid turnarounds, appellant in October, 1969, borrowed $200,-000 from a bank to invest with deGive, and that month the broker purchased 58 stocks valued in excess of $1.4 million. These were all sold on January 28–29, 1970, on appellant's express instructions following a recommendation to sell from deGive. On March 2–3, 1970, deGive purchased for appellant 29 stocks valued at $480,874. Appellant revoked deGive's trading authority on April 3, 1970. The net losses for the 285 trades involved on the seven "major moves" in question totaled $599,046—during the same period the Dow Jones Industrial Average had declined nearly 150 points—with commissions to Dominick of $73,480.75, of which deGive retained one-third. In 1968, before the period of time here in question, deGive had made $14,000 from commissions on appellant's account, in 1969 he made $18,000, and in 1970 about $6,000, his total

income in both 1968 and 1969 equalling about $100,000 per year.

*Alleged "Clearly Erroneous" Findings*

■ Appellant argues that several of the trial court's findings in this bench trial were "clearly erroneous." Fed.R.Civ.P. 52(a). The principal findings under attack are that there was a "system" which deGive followed during the period in question; that proof of his good faith was shown by his following his own public market letters and by parallel trading in his wife's account; and that deGive's credibility was greater than appellant's. In reviewing these findings, we may not substitute our judgment on facts for that of the trial judge, who was in a superior position to appraise the evidence, and we may not reverse his findings unless, on the entire record, we are " 'left with the definite and firm conviction that a mistake has been committed.' " *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). We are not left with any such conviction here.

■ The argument that deGive did not have a "system," or at least did not use it consistently, is based on four elements of alleged proof. The first, that his testimony was inconsistent as to the number of buy and sell indicators he used, appears answered by the fact that at one point he testified as to indicators for the market as a whole, whereas at another point he testified as to indicators on seven specific charts for 1969, four of which charts were used for the selection of particular stocks after signals for the market as a whole has been derived from the other three.[2] The second element of "proof," that deGive could not consistently state whether he would buy (or sell) if 50% of his "indicators" pointed in that di-

---

2. The associated claim, to the effect that de-Give's deposition testimony as to the number of indicators in a particular exhibit is inconsistent with his trial testimony, is met if his deposition statement as to "four oscillators" is translated, as the evidence permits, to mean four "buy" and four "sell" indicators, and it is recognized that he discounted one buy and sell indicator, which he testified was "minor."

rection, is answered by his own response to counsel's questioning, to the effect that the 50% level was a minimum and that he required more than a 50% confirmation from his indicators before he would act on appellant's accounts. Appellee deGive's effort to be extra cautious in handling appellant's accounts is certainly not "proof" that he lacked a system. The third element, that deGive made virtually no major moves in 1967 and 1968, yet made only major moves in 1969, thus not operating the system in the same way, is countered by the fact that he had made a "major" move in November, 1966, when he bought almost $1.2 million of stock in 11 days, thereby committing most of appellant's funds during the long bull market of 1966–67 when the system continued to emanate buy signals. The fourth, that he had no system because he had no account of his own, is readily answered by the fact that he had several children in college and no funds of his own; his wife did have an account, on which the system was used. We cannot say that the trial court's findings as to the existence of a system and deGive's good faith belief in it are clearly erroneous.

deGive's investments for appellant closely followed the recommendations of his newsletter and his investments for his wife. Recommending in his newsletter on May 26, 1969, that "weak holdings" should be eliminated, for example, he sold out appellant's and Mrs. deGive's purchases of earlier that month; the Dow Jones Industrial Average dropped over 100 points in the next six weeks.[3] deGive's trading for his wife's account and that of appellant was closely parallel, with the two going in or out of the market on roughly the same scale at the same time. He was a little slower selling on appellant's account on two occasions in late 1969, but this hardly gives rise to a churning claim.

The other errors alleged by appellant are similarly insubstantial. In connection with the question whether short-term trading was authorized, the trial court did make an erroneous statement in its findings to the effect that in 1968 appellant had profits. In fact 1968 trading had resulted in $180,-000 losses, but the court noted elsewhere that there were losses in 1968, so that the error was at most inadvertent and in any event is immaterial because appellant had not objected to short-term trading at other previous times when it did result in profits. Other alleged factual errors by the lower court in respect to the amount of correspondence between the parties, the supervision of deGive by Dominick officers, the nature of appellant's accounts, and points of credibility going to inconsistent testimony of deGive, who was cross-examined for three days as well as at deposition, have all been examined and found wanting. On the credibility questions in particular, we must defer to the findings of the trial judge, who of course had the opportunity to assess the demeanor of the witnesses, which had especial bearing on the issues of motive and good faith. See Fed.R.Civ.P. 52(a); *International Railways v. United Brands Co.*, 532 F.2d 231, 241 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976); *M. W. Zack Metal Co. v. S.S. Birmingham City*, 311 F.2d 334, 336–37, 338 (2d Cir. 1962), *cert. denied*, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2586 (1971). In short, none of the trial judge's findings of fact are clearly erroneous.

*Limited Cross-Examination*

■ At the end of appellant's examination of deGive, counsel sought to inquire as to certain diary entries shown by deGive before the suit to Jerome Kamerman, an attorney for appellant. The diary entries

---

**3.** Appellant cites one instance of inconsistency between the newsletter's advice and deGive's trading for appellant. On November 10, 1969, the newsletter recommended deferral of new buying, advice that does not necessarily indicate anything about selling. Yet appellant contends that deGive's sale of a small portion

($81,000) of appellant's portfolio at a profit was somehow inconsistent with the newsletter. In any event, deGive satisfactorily explained that the sales were to recoup some earlier losses and to take advantage of the tax deduction resulting from those losses.

purported to show meetings with appellant that, according to appellant, never took place; appellant contends that the entries were subsequently manufactured, thereby indicating consciousness of fraud on the part of deGive. Appellees argued that the evidence was inadmissible (and cross-examination on it improper) because Kamerman, who was also a partner in an accounting firm named Kamerman & Kamerman, had obtained the information improperly, by appearing to act as an accountant and not advising deGive that he was acting as an attorney.[4] The court excluded the evidence.

We need not reach the question whether the exclusion was proper as an exercise of the trial court's supervisory power in the face of an apparent breach of legal ethics, as appellees argue, for the trial court also acted under Fed.R.Evid. 403. We cannot say that the trial court abused its discretion in concluding that the evidence's probative value was "substantially outweighed" by considerations of confusion, delay, or waste of time. *See generally United States v. Robinson*, 560 F.2d 507 (2d Cir. 1977) (en banc). The issue with which the diary entries were concerned was a collateral one, involving deGive's credibility. While ordinarily it may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records, and testimony based on them, here Judge Pierce became aware of the content and purport of the diary records in the course of making his ruling. His exclusion, based largely on the time this collateral issue would take, cannot be said to be erroneous.

### Violations of NYSE Rules

Appellant's final assertions of error relate to certain violations by appellees of NYSE rules, particularly Rule 405, which requires NYSE member organizations to use "due diligence" in learning the facts relative to each account and order and to supervise their brokers, and Rule 408, which imposes particularly stringent supervision requirements for "discretionary accounts," those in which the broker is authorized to use his own discretion without consulting the customer. It seems quite clear that there was technical noncompliance with these rules, although appellees contend that there was compliance with the substance and spirit of the rules. The district court dismissed before trial, on grounds relating to the inadequacy of the pleadings and supporting affidavits, the count of the complaint (Count V) seeking damages for direct violations of the NYSE rules, but it allowed appellant to attempt to prove such violations as part of her effort to establish common law fraud and Rule 10b–5 bases of liability.

Appellant here argues that she should have been allowed to go to trial on Count V, which was based directly on NYSE rule violations. Whether such a private action against a stock exchange member may be maintained is an open question in this circuit, although there is persuasive authority in favor of allowing it, at least with regard to fairly specific NYSE rules like 405 and 408, *see, e. g., Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 141–43 (7th Cir.), *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969); *Starkman v. Seroussi*, 377 F.Supp. 518, 523–24 (S.D.N.Y.1974) (Weinfeld, J.); Note, *Private Actions as a Remedy for Violations of Stock Exchange Rules*, 83 Harv.L.Rev. 825, 836–38 (1970); *cf. Lank v. NYSE*, 548 F.2d 61, 64–66 (2d Cir. 1977) (discussion of scope of private action for failure of NYSE to enforce its rules); *but see Landy v. FDIC*, 486 F.2d 139, 166–67 & nn. 25–26 (3d Cir. 1973), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). *See generally Van Gemert v. Boeing Co.*, 520 F.2d 1373, 1380–82 (2d Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975); *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 180–82

---

**4.** Appellant points out that Kamerman had informed deGive's firm, Dominick, that he was acting as appellant's attorney. This would not, of course, relieve Kamerman of the obligation separately to inform deGive, who was named as a separate defendant by appellant, although it would be relevant to the question whether deGive had actual knowledge of Kamerman's status.

(2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966); Wolfson & Russo, *The Stock Exchange Member: Liability for Violation of Stock Exchange Rules*, 58 Calif.L.Rev. 1120 (1970).

We need not reach the question here, however. Even assuming such a rules violation is actionable, Judge Pierce found, appellant, in seeking to prove her fraud claims, "failed to establish a causal connection between the technical violations of the NYSE rules and the alleged losses sustained." We cannot say that this finding was clearly erroneous.[5] Appellant's only contention to the contrary is based on her expert's testimony, but that testimony the trial court found, as was its prerogative, not to be worthy of credit. Appellant does not contend either that she has evidence tending to prove a causal connection that was not submitted below because of the dismissal of Count V or that the governing legal principle for evaluating a causal connection would be different in the context of a direct action for violation of NYSE rules. Regardless of the legal foundation of appellant's claim, if she cannot show that the rules violations caused her injury, she cannot recover. *See Baird v. Franklin*, 141 F.2d 238, 239 (2d Cir.) (A. Hand, J.), *cert. denied*, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944). Because the causal connection issue appellant was allowed to prove at trial was the same as that she would have had to prove in relation to Count V, there plainly would be no purpose served by reversing as to Count V and requiring a new trial on that count alone. *See Neaderland v. Commissioner of Internal Revenue*, 424 F.2d 639, 641–42 (2d Cir.), *cert. denied*, 400 U.S. 827, 91 S.Ct. 53, 27 L.Ed.2d 56 (1970).

### Attorneys' Fees

There is no statutory provision permitting the award of attorneys' fees to a successful party in an action based on Section 10(b) of the Securities Exchange Act of 1934, pursuant to which Rule 10b–5 was promulgated. Appellees argue on their cross-appeal, however, that such fees should be allowed by analogy to the express allowance of attorneys' fees in connection with the two statutorily authorized private rights of action under Sections 9(e) and 18(a) of the 1934 Act, 15 U.S.C. §§ 78i(e) (manipulation), 78r(a) (misleading registration). They reason that Congress, when it created rights of action under the 1934 Act, also authorized the awarding of attorneys' fees with the apparent purpose of deterring nuisance or "strike" suits, *cf. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (1934 congressional purpose in adding attorneys' fees provision to Securities Act of 1933, § 11(e), 15 U.S.C. § 77k(e) (false registration)). The courts, they argue, in implying a private right of action under Rule 10b–5, therefore ought to authorize fee awards for the same reason.

While the argument has surface plausibility, it ignores the Supreme Court's holding in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), that "the circumstances under which attorneys' fees are to be awarded and the range of discretion of the courts in making those awards are matters for Congress to determine," *id.* at 262, 95 S.Ct. at 1624; *see Jackson v. Oppenheim*, 533 F.2d 826, 831 (2d Cir. 1976). Congress has been on notice that the courts would imply a private right of action under Rule 10b–5 at least since the early 1950s, *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); *Fischman v. Raytheon Manufacturing Co.*, 188 F.2d 783 (2d Cir. 1951), and perhaps earlier, *Kardon v. National Gypsum Co.*, 69 F.Supp. 512

---

**5.** The trial court in essence found that, given deGive's standing in the financial community, the complexity of his system, and his relationship over many years with appellant's accounts, the supervisory officers at Dominick would have done no more than "rubber stamp" deGive's investment decisions, even had the NYSE rules relating to supervision been followed to the letter. Appellant argues that the Exchange rules are designed to provide "two heads" rather than one on any account, but here, by a course of conduct long acquiesced in, it was only deGive's head (and charts) in which appellant was interested.

**554**

(E.D.Pa.1946). *See generally Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 730, 95 S.Ct. 1917; 1 A. Bromberg, *Securities Law* § 2.2(460) (1975). The fact that Congress has not expressly authorized fee awards in such cases during the intervening years is at least as consistent with the thesis that Congress did not intend to allow such awards as it is with the thesis put forward by appellees. *See The Supreme Court, 1974 Term,* 89 Harv.L.Rev. 47, 176–77 (1975). Accordingly, in the absence of a clear expression of congressional intent, the district court properly denied appellees' motion for attorneys' fees.

Judgments affirmed.