**CRANE CO., Plaintiff,**

v.

**AMERICAN STANDARD, INC. and Blyth & Co., Inc., Defendants.**

**No. 68 Civ. 1845.**

United States District Court, S. D. New York.

Sept. 2, 1977.

Pomerantz, Levy, Haudek & Block, and Lord, Day & Lord, New York City, for plaintiff; Abraham L. Pomerantz, John W. Castles 3d, Michael J. Murphy, Peter J. McKenna, New York City, of counsel.

Sullivan & Cromwell, New York City, for American Standard, Inc.; Edward W. Keane, Robert M. Osgood, Marcia B. Paul, James E. Tyrrell, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for Blyth & Co., Inc.; Leonard A. Spivak, Donald S. Parker, Helene Fromm, New York City, of counsel.

ROBERT J. WARD, District Judge.

This action has a protracted and peripatetic history. It comes to this Court bearing the mandate of two Court of Appeals decisions *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970) ("*Crane I*") and *Crane Co. v. American Standard Inc.*, 490 F.2d 332 (2d Cir. 1973) ("*Crane II*").

I. *Background*

This suit arose out of the battle for control of Westinghouse Air Brake, Inc. ("Air Brake"). Crane Company ("Crane") approached Air Brake's management in re-

gard to a possible merger on May 15, 1967 and on June 15 of that year began making substantial purchases of Air Brake stock. On November 3, 1967, Air Brake spurned Crane's merger proposal. Undaunted, and already the beneficial owner of almost ten percent of Air Brake's outstanding stock, Crane continued to accumulate Air Brake shares.

In December of 1967, Paul Devlin, chairman of the investment banking firm of Blyth and Company ("Blyth") contacted A. King McCord, chairman of Air Brake, and, on behalf of American Standard Inc. ("Standard"), offered the latter's assistance in resisting Crane's takeover effort.

Crane filed the requisite 14–B statements with the Securities and Exchange Commission ("the SEC") on February 20, 1968 in order to solicit proxies for the election of Air Brake directors. At this time, Air Brake stock was selling on the New York Stock Exchange for approximately $36 per share. Not long thereafter, a majority of the Air Brake directors approved a merger of Air Brake into Standard based on an exchange of one share of Standard convertible preferred stock worth about $50 for each Air Brake share. Air Brake stock rose to $44.

Crane responded by offering to exchange Crane subordinated debentures with a total face value of about $50 for each Air Brake share. This offer was to end at 5 P.M. on April 19, 1968. During the same week that Crane mailed its offer to the Air Brake stockholders, Air Brake sent out its proxy statement seeking proxies in favor of the proposed merger with Standard. The value of Air Brake stock was about $49 on April 10.

On April 17, 1968, Crane brought suit in this Court claiming misrepresentations in the Air Brake proxy statement and asking for an injunction against continued solicitations and use of the proxies and "such other

and further relief as to this Court may seem just and proper. . . ." Later, on May 6, 1968, Crane filed a second action ("the fraud action") naming Standard and Blyth as defendants and charging violations of Sections 9, 10, and 14 of the Securities Exchange Act of 1934 ("1934 Act") (15 U.S.C. § 78i, 15 U.S.C. § 78j, 15 U.S.C. § 78n), Rules 10b–5 and 10b–6 (17 C.F.R. § 240.10b–5, 17 C.F.R. § 240.10b–6) and Regulation 14A (17 C.F.R. 240.14a–1 *et seq.*). The complaint in Crane's second action sought to enjoin Standard from voting Air Brake stock, buying Air Brake shareholders' votes, consummating the merger, and from engaging in violations of the 1934 Act. It did not ask for damages, but did request "such other and further relief as may be just and proper."

The Air Brake stockholders meeting began on May 16, 1968. On May 21, while the proxies were still being counted, trial of both of Crane's complaints, which had been consolidated, commenced before Judge Ryan of this Court. On June 5, the Judge dismissed both complaints; on June 7, the Air Brake—Standard merger became effective.

Before the Court of Appeals, this dismissal was affirmed in part and reversed in part, and remanded for further proceedings. The Second Circuit held for Crane on one claim of the fraud action concerning certain transactions in Air Brake stock by Standard on April 19, 1968. On that day, Standard purchased 82,400 shares[1] on the market for cash at an average price of $49.08 while it engaged in undisclosed sales of 100,000 shares to a friendly investment company at 44½ and 20,000 shares to a friendly investment banking house at 44⅞.

Following the remand, the litigants became locked in what Judge Friendly has aptly dubbed, "a Brobdingnagian procedural imbroglio," 490 F.2d at 334. Rather than recount the details, it suffices to say that

---

1. Apparently due to an error in Standard's records or by a Standard employee, the number of Air Brake shares purchased by Standard on April 19 was originally reported to have been 170,200. This error was reflected in the opinions of the Court of Appeals. 419 F.2d at 792; 490 F.2d at 336. At the 1976 trial the mistake was brought to the Court's attention and therefore the correct figure of 82,400 shares is used.

the action was again returned to this Court with the direction, "to get on with the task which the concluding paragraph of our earlier opinion directed it to perform." *Id.* at 345.

Although the niceties of English prose form might suggest otherwise, it seems advisable to quote verbatim from the Court of Appeals' mandate in *Crane II* even to the extent that it cited the earlier decision in *Crane I* in order that this Court's mission may be most accurately set forth.

As stated in *Crane II*, referring to the decision in *Crane I*:

> The court held that [the activities of April 19] violated § 9(a)(2) of the Securities Exchange Act, which makes it illegal to effect "a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others," and that non-disclosure of the sales violated SEC Rule 10b–5(3) which makes it illegal "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Apparently because of Crane's later forced sale of the American Standard stock it received in the merger, 419 F.2d at 794, the court further concluded that Crane came within the class of persons whom § 9(e) protects against violation of § 9(b), to wit, "any person who shall purchase or sell any security at a price which was affected by such act or transaction." Finally, the court held that under *Vine v. Beneficial Finance Co.*, 374 F.2d 627, 634–35 (2 Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), Crane met the "in connection with" requirement of *Birnbaum v. Newport Steel Co.*, 193 F.2d 461 (2 Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

490 F.2d at 336.

> Later, the *Crane II* panel observed that the task of calculating what damages Crane may have suffered by the one act of wrongdoing found to have been committed by Standard would demand prodigies of prophecy and measurement beyond the capacity of jurors and perhaps of a judge. While this court found "that the causation requirement is satisfied here to the extent of imposing liability upon Standard for the consequences of concealing from the public material information relevant to the market value of Air Brake stock," 419 F.2d at 797, it did not determine what these consequences were. Certainly it is not to be merely assumed that but for Standard's acts on April 19, 1968, Crane's tender offer would have succeeded and the merger would have failed. Mr. Justice Harlan emphasized in [*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 389, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970)] that in cases like this "damages should be recoverable only to the extent that they can be shown." Quite conceivably a judge here might find the chain of causation so dubious and the task of determining damages so elusive as to lead him to decide that, except for some items that may be readily provable, he could not properly award anything save perhaps attorneys' fees, see *Mills, supra*, 396 U.S. at 389–97.

*Id.* at 343–44.

The curtain rose on the next act of Crane against Standard on April 5, 1976 and was finally brought down on May 21, 1976 when the trial of this action was concluded.

## II. *The Impact of Chris-Craft*

### A. *Introduction*

After the trial of this action but before the Court had rendered a decision, the Supreme Court handed down its opinion in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) ("*Chris-Craft*"). *Chris-Craft*, too, involved a contest for control of a target corporation. The Court held that, "a tender offeror, suing in its capacity as a takeover bidder, does not have standing to sue for damages under the Williams Act." *Id.* at 42, n.

28, 97 S.Ct. at 949. It was also held that, under the facts presented, Chris-Craft lacked standing to sue for damages caused by the successful contestant's alleged violations of Rule 10b–6. *Id.* at 44, 97 S.Ct. 926.

### B. The Effect of Subsequent Authority on the Mandate of Crane I and II

■ A district judge does not sit to review the decisions of the Court of Appeals. Ordinarily, the lower court simply carries out a mandate as it is received without reexamination. However, this doctrine is not wholly without exception. This Court is not bound by the mandate of the Court of Appeals if the Supreme Court has subsequently changed or clarified the relevant law.

In *Page v. St. Louis Southwestern Ry. Co.*, 349 F.2d 820 (5th Cir. 1965) the Fifth Circuit observed:

> Here again for the second time after a second trial, this case is not yet over. Unfortunately, we must reverse and remand for still a third trial. We must do so not because the District Judge failed to follow our pronouncements but rather because he did.

In that case, the district court had adhered to a prior holding of the Court of Appeals despite interim contradictory decisions of the Supreme Court. Upon the second appeal, after the observation noted above, the Court of Appeals stated the following principle:

> [W]here the point is properly preserved for review, a different result is compelled where, subsequent to the first decision, there is an intervening change in the law by authoritative declaration of the authoritative court. *Lumbermen's Mutual Cas. Co. v. Wright*, 5 Cir., 1963, 322 F.2d 759, 763; *Pacific American Fisheries v. Hoof*, 9 Cir., 1923, 291 F. 306, *cert. denied*, 263 U.S. 712, 44 S.Ct. 38, 68 L.Ed. 520; *Messinger v. Anderson*, 1912, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152.

*Id.* at 821.

This principle was reiterated in *Harkless v. Sweeny Ind. School District*, 388 F.Supp. 738, 746 (S.D.Texas 1975):

> There is . . . an exception to the "law of the case" doctrine which is well recognized in this Circuit. The doctrine does not apply where "there is an intervening change in the law by authoritative declaration of the authoritative court." *Page v. St. Louis Southwestern Ry.*, 349 F.2d 820, 821 (5th Cir. 1965). The instant case is a classic example of such an intervening change in the law.

The Second Circuit has recognized this exception. In *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 178 (2d Cir. 1967), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968), the Court noted with approval that

> Other courts in applying the law of the case rule have held that a lower court is not bound to follow the mandate of an appellate court if the mandate is, in the interim, affected by an authority superior to the court issuing the mandate.

And, in *Winters v. Miller*, 517 F.2d 1337, 1339 (2d Cir. 1975), the Court of Appeals ruled that the district judge was obliged to follow its prior order absent, "supervening federal law."

*Standard Oil Co. v. United States*, 429 U.S. 17, 97 S.Ct. 31, 50 L.Ed.2d 21 (1976) (per curiam) also provides some support for this exception. The court held that appellate leave need not be obtained before a district court could reopen a case which had been reviewed on appeal in order to consider a Rule 60(b) Fed.R.Civ.P. motion. Requiring appellate leave, "adds to the delay and expense of litigation and also burdens the increasingly scarce time of the federal appellate courts." *Id.* It was also noted that, "[l]ike the original district court judgment, the appellate mandate relates to the record and issues then before the court, and does not purport to deal with possible later events." *Id.*

Accordingly, this Court will analyze the impact of recent developments on the instant action.

### C. The Parties' Contentions

The parties in this action were asked to submit memoranda analyzing the impact of

*Chris-Craft* on the instant case. The response was as follows:

Standard emphasized the similarity of the two cases, noting that Rule 10b–5 and § 9, relied upon by Crane here, were both among the bases for Chris-Craft's original complaint. Standard asserts that the legislative history of the 1934 Act evidences no intent that these provisions would be applied to tender offers, or provide a private cause of action for a defeated offeror. According to Standard, if a statute designed to regulate tender offers—the Williams Act—does not give an offeror standing to sue for damages, it would be anomalous to derive such a right of action from statutes directed at other ends. The wording of Rule 10b–5 is compared to that of § 14(e) and found to be strikingly similar.

Standard insists that the *Chris-Craft* reasoning applies with equal force to Crane's claims. Neither § 9 nor Rule 10b–5 nor § 14(e) expressly provide a tender offer contestant with a cause of action for damages; can the Courts infer such a remedy? Like the Williams Act, the 1934 Act as originally promulgated was designed to protect the public investor. Contestants for corporate control, Standard claims, are not members of the class sought to be protected by either the 1934 Act or the Williams Act amendments. Indeed, members of the protected class—shareholders—stand to suffer if corporate combatants secure a cause of action for damages.

Deterence of unlawful conduct in the tender offer situation is no more likely through a § 9 or § 10 remedy than through § 14(e) relief, Standard argues. Instead, injunctive relief is most appropriate.

Just as the Supreme Court found Chris-Craft's Rule 10b–6 claim lacking, says Standard, Crane's § 9 claim is without merit. Neither provision is concerned with tender offer battles. Using reasoning similar to that used in *Chris-Craft*, Standard argues that Crane cannot rely upon § 9 because it neither purchased nor sold Air Brake stock at a price affected by Standard's manipulation.

Standard concludes that federal law provides no damage remedy for a defeated combatant in a tender offer contest.

Blyth adopts Standard's arguments and further asserts that under *Chris-Craft* and *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (*"Santa Fe"*), Crane lacks standing to sue Blyth. Blyth compares Chris-Craft's claim that it lost the chance to gain control of Piper to Crane's complaint that it lost the chance to control Air Brake. It is argued that Crane's § 9 claim can be analyzed in terms of the *Chris-Craft* court's discussion of the Rule 10b–6 question presented by that suit.

Blyth goes on to argue that *Santa Fe* has confirmed that the holding of *Chris-Craft* should not be confined to § 14(e) but must be extended to all of the anti-fraud provisions of the 1934 Act, quoting the following statement:

> Congress did not expressly provide a private cause of action for violations of § 10(b). Although we recognized an implied cause of action under that section in some circumstances, *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. [6], 13 n. 9 [92 S.Ct. 165, 30 L.Ed.2d 128] [1971] we have also recognized that a private cause of action under the anti-fraud provisions of the Securities Exchange Act should not be implied where it is "unnecessary to ensure the fulfillment of Congress' purposes" in adopting the Act. *Piper v. Chris-Craft Industries*, 430 U.S., at 41 [97 S.Ct. 926, at 949, 51 L.Ed.2d 124]. *Cf. J. I. Case Co. v. Borak*, 377 U.S. 426, 431–433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

430 U.S. at 477, 97 S.Ct. at 1303.

Not only does Blyth argue that a Crane claim for damages as a defeated contestant for control cannot survive *Chris-Craft* and *Santa Fe*, it also asserts that Crane's status as a "forced seller" does not permit an award of damages. *Santa Fe* indicates that a 10b–5 claim can stand only if the conduct complained of was manipulative or deceptive and a threat to bring a divestiture action cannot be so denominated.

Crane, naturally, draws quite a different lesson from *Chris-Craft*. That decision, it is asserted, does not impair Crane's standing in this action; its holding is a narrow one. The broad scope of the interests designed to be protected by the 1934 Act is contrasted to the narrow aim of the Williams Act.

Further, Crane's trial posture as both a defeated tender offeror and a defrauded seller is argued, with emphasis upon the *Crane I* holding that Crane had standing to sue by virtue of its position as a forced seller.

■ Plaintiff argues that the Supreme Court's holding regarding 10b–6 does not jeopardize its standing under § 9. Crane insists that its sale was at a price affected by the defendants' manipulation. Policy considerations emphasized by the Court in *Chris-Craft* are asserted to support Crane's position in this litigation. And, common law claims are said to permit recovery under the court's pendent jurisdiction even if standing does not exist under the securities laws.[2]

### D.  *The Court's Analysis*

After a careful weighing of the arguments submitted by the parties, the Court finds defendants' contentions more persuasive than Crane's. Although the case is not directly analogous, the reasoning of *Chris-Craft* appears to preclude suit by Crane.

■ The Supreme Court in *Chris-Craft* emphasized that a private right of action should be implied where necessary to protect public investors. 430 U.S. at 25, 97 S.Ct. 926. Such protection must be the focus of an inquiry as to standing.

The Court in *Chris-Craft* made clear its understanding that § 14(e) was designed to aid the target shareholders not the contestants in a tender offer battle. Legislative history is quoted in the opinion describing

the latter as " 'corporate raiders' " and " 'takeover pirates'." 430 U.S. at 28, 97 S.Ct. 926. Does this reasoning extend to the rest of the 1934 Act?

■ In *Lank v. New York Stock Exchange*, 548 F.2d 61, 65 (2d Cir. 1977) the Court of Appeals reiterated the rule,

> that before a private right of action may be inferred the would-be plaintiff must show that he is within the class the statute is intended to protect, and that it is not sufficient merely to show that the defendant is within the class the statute is designed to regulate.

The Court went on to state that, "[t]he beneficiary of the 1934 legislation was intended to be the public investor." *Id.  See also Arneil v. Ramsey*, 550 F.2d 774, 783 (2d Cir. 1977). It appears that the public investor is the beneficiary of the entire 1934 Act, not simply the Williams Act amendments. *See Santa Fe, supra*, 430 U.S. at 477, 97 S.Ct. 1292.

Evenhandedness in dealing with both sides in a takeover contest is stressed as an important aspect of the Williams Act. But the Supreme Court differed with the Second Circuit which had found this supportive of a private right of action.

> This express policy of neutrality scarcely suggests an intent to confer highly important, *new rights* upon the class of participants whose activities prompted the legislation in the first instance.

430 U.S. at 30, 97 S.Ct. at 943 (emphasis added).

This reference to "new rights" implies that the Court did not believe that tender offerors had a cause of action prior to the Williams Act. There is a definite similarity between Rule 10b–5 and § 14(e). In *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 940–41 (2d Cir. 1969), Judge Friendly observed:

2.  Crane claims that even if it lacks standing to sue under the federal securities laws, principles of pendent jurisdiction require this Court to adjudicate any claims it may have under state law. The Court disagrees. When the federal claim is dismissed, the jurisdictional peg on

which the state cause of action could hang, is no longer present. *See generally Girard v. 94th St. & Fifth Avenue Corp.*, 530 F.2d 66, 72 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Kavit v. A. L. Stamm & Co.*, 491 F.2d 1176, 1179 (2d Cir. 1974).

In effect [§ 14(e)] applies Rule 10b–5 both to the offeror and to the opposition—very likely, except perhaps for any bearing it may have on the issue of standing, only a codification of existing case law.

Later in that same opinion he noted that § 14(e), "largely tracks the substantive provisions of Rule 10b–5." *Id.* at 945.

Section 14(e), unlike Rule 10b–5, contains no purchaser-seller requirement. *See H. K. Porter Co., Inc. v. Nicholson File Co.*, 482 F.2d 421, 424 (1st Cir. 1973). This omission, the Supreme Court held, did not assist the tender offeror.

The omission of the purchaser-seller requirement does not mean, however, that Chris-Craft has standing to sue for damages under § 14(e) in its capacity as a takeover bidder. It may well be that Congress desired to protect, among others, shareholders-offerees who decided not to tender their stock due to fraudulent misrepresentations by persons opposed to a takeover attempt. See generally 1 A. Bromberg, *supra*, § 6.3 (101b), at 122.17. See also Senate Report, at 2; House Report, at 3. These shareholders, who might not enjoy the protection of § 10(b) under *Blue Chip Stamps v. Manor Drug Stores, supra,* could perhaps state a claim under § 14(e), even though they did not tender their securities. But increased protection, if any, conferred upon the class of shareholders-offerees by the elimination of the purchaser-seller restriction can scarcely be interpreted as giving protection to the entirely separate and unrelated class of persons whose conduct the statute is designed to regulate.

430 U.S. at 38, 97 S.Ct. at 948.

Crane, like Chris-Craft, is undoubtedly a member of the regulated class.

The Supreme Court carefully distinguished the role of the target shareholder from that of the tender offeror.

As a tender offeror actively engaged in competing for Piper stock, Chris-Craft was not in the posture of a target shareholder confronted with having to decide whether to tender or retain its stock. Consequently, Chris-Craft could scarcely

have alleged a need for the disclosures mandated by the Williams Act. In short, the fact that Chris-Craft necessarily acquired Piper stock as a means of taking over Piper Aircraft adds nothing to its § 14(e) standing arguments.

430 U.S. at 35, 97 S.Ct. at 946.

The damages sustained by Chris-Craft through its ownership of Piper stock were found to be a result of its activity as a contestant for control.

Similarly, here, Crane's damages were part and parcel of its role as a combatant in the takeover battle. It too was not in the position of a target shareholder faced with the decision to tender or hold its stock.

The Supreme Court did not view deterrence as a likely product of its creation of a private remedy for a defeated tender offer contestant. Indeed, the more probable result forecast was discouragement of future tender offers through the threat of monumental damage awards. 430 U.S. at 37, 97 S.Ct. 926. Further, the Court noted, these awards would come in part from the pockets of the innocent target shareholders. Rather then exacting huge damages after the fact, injunctive relief early in the battle was suggested as the best recourse. 430 U.S. at 41, 97 S.Ct. 926. *See Electronic Specialty Co. v. International Controls Corp., supra* at 947. These considerations apply here as they did in *Chris-Craft.*

The Supreme Court's determination of the standing issue in *Chris-Craft* was certainly not anticipated. The Court of Appeals below had found standing under § 14(e). 480 F.2d 341, 358 (2d Cir. 1973). In doing so, Judge Timbers cited *Crane I* for support. *Id.* at 360. In *Crane I* it was clear that the Court expected the Williams Act to confer standing in the tender offer context. The Second Circuit reinforced its holding with the following observation.

We find violation of both section 9(a)(2) and Rule 10b–5 and standing in Crane to raise the issue. The amendment to the Act adding section 14(e) (15 U.S.C. § 78n(e)) effective July 29, 1968, subsequent to the events here in question,

should serve to resolve any doubts about standing in the tender offer cases, even where an offeror is not, as is Crane, in the position of a forced seller.

419 F.2d at 798–99.

The expectation, now shown to have been misplaced, that § 14(e) would provide one in Crane's position with a cause of action, presumably influenced the Court of Appeals in deciding *Crane I.*

The Supreme Court's analysis of Chris-Craft's Rule 10b–6 claim sheds new light on Crane's § 9 claim. The Court stated:

Unlike § 10(b), however, § 9 provides an express cause of action for persons injured by unlawful market activities. 15 U.S.C. § 78i(e). Yet, that cause of action is framed specifically in favor of "any person who shall purchase or sell any security *at a price which was affected by such act or transaction* . . . ." 15 U.S.C. § 78i(e). (Emphasis supplied.) Congress therefore focused in § 9 upon the amount actually paid by an investor for stock that had been the subject of manipulative activity. This is not, as we have seen, the gravamen of Chris-Craft's complaint. It seeks no recovery for an improper premium exacted for Piper stock; rather it desires compensation for its lost opportunity to control Piper. We therefore conclude that, on its claimed basis for relief, Chris-Craft cannot avail itself of Rule 10b–6.

430 U.S. at 46, 97 S.Ct. at 952.

Similarly, the gravamen of Crane's complaint is the lost opportunity to control Air Brake. Crane is not attempting to recover "for an improper premium exacted for [Air Brake] stock." Crane is not in the position of an investor who has paid too much for stock that has been subject to manipulation.

The Court in *Chris-Craft* noted the "close relationship" between Rule 10b–6 and § 9. In an analysis of the former provision, it was noted that:

the fact remains that Rule 10b–6 is not directed at or concerned with contests for

corporate control. This technical rule is focused narrowly upon a precise goal—maintaining an orderly market for the distribution of securities free from artificial or manipulative influences. Thus, as the issues have been framed, Chris-Craft did not come to the courts in the posture of a hoodwinked investor victimized by market manipulation; its complaint, as we noted, is that it lost a chance to gain control of a corporation, a claim beyond the bounds of the specific concern of Rule 10b–6.

430 U.S. at 45, 97 S.Ct. at 951.

Crane too is not a "hoodwinked investor."

Crane did not buy or sell Air Brake stock on the New York Stock Exchange on April 19th or at any time thereafter. Nearly two months later, Crane did sell Standard preference stock that it had acquired in the merger. Reading the relevant provisions of § 9 in light of *Chris-Craft* it seems quite a leap to reason that Crane acquired standing by virtue of the later sale.[3] Although Chris-Craft had bought "Piper common stock, the very class of securities with respect to which Bangor was held to have committed Rule 10b-6 violations," 430 U.S. at 44, 97 S.Ct. at 951, the fact that Chris-Craft sought to recover for the lost opportunity to control Piper barred it from standing under the anti-manipulation provision.

■ The reasoning of *Chris-Craft* appears to bar Crane's suit. The public investor is the beneficiary of the 1934 Act. Regulated parties—like the tender offeror—should not be permitted to take refuge in it to the potential detriment of shareholders. Crane does not have a damage remedy in its role as a defeated contestant in a takeover battle.

III. *The Recent Trend in Securities Law*

A. *Introduction*

*Chris-Craft* does not stand alone. It is not *sui generis*, distinguishable from all oth-

---

3. In *American Standard Inc. v. Crane Co.*, 510 F.2d 1043 (2d Cir. 1974), *cert. denied*, 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975), it was determined that for § 16(b) purposes

Crane's sale of Standard preference stock could not be matched against its purchase of Air Brake common stock.

er cases because of unusual facts or esoteric points of law. Instead, it is one of several recent Supreme Court decisions which indicate that the Court is taking a hard, new look at federal jurisdiction under the securities laws. Included in this trend are *Santa Fe, supra; TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); and *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (*"Blue Chip"*).

This trend has attracted comment:

In the last four years the United States Supreme Court has fundamentally altered the scope of the coverage and protection that the federal securities laws offer to the investing public. The depth and sweep of this change have been particularly extraordinary when one considers the short period of time involved. Before recent Supreme Court decisions, plaintiffs' lawyers and the Securities and Exchange Commission had been relatively free to devise original and imaginative causes of action based upon the federal securities laws. Following these decisions, however, the entire momentum has shifted. In these recent holdings, the Supreme Court has consistently decided in favor of the defendants and has enunciated principles that may circumscribe the rights of plaintiffs under the federal securities laws for many years to come.

Lowenfels, Recent Supreme Court Decisions Under the Federal Securities Laws: The Pendulum Swings, 65 *Geo.L.J.* 891, 891–92 (1977). *See also* Castruccio, Developments in Federal Securities Regulation—1976, 32 *Bus.Law.* 1537 (1977).

### B.  *Blue Chip and Problem of Proof*

Of the recent Supreme Court cases which suggest a restrictive approach to the securities laws, *Blue Chip* is most relevant to the instant matter. It was observed that the Second Circuit, "did not have the benefit of our decision in *Blue Chip* in resolving the standing issue," in *Chris-Craft.* 430 U.S. at 44, 97 S.Ct. at 951.

The question of Crane's standing under both § 9 and § 10 was resolved in *Crane I* through use of a "forced seller" analysis.

The success of Standard's maneuver made Crane a forced seller of the newly issued Standard convertible preferred under threat of a divestiture action to be brought by Standard under the antitrust laws.

419 F.2d at 798. This reasoning was compared to the rationale of *Vine v. Beneficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). *Id.* at 794, 798.

Prior to *Blue Chip,* any discussion of standing under Rule 10b–5, began with the Second Circuit's 1952 decision in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952) (*"Birnbaum"*). In the years following the *Birnbaum* rule, however, its limits were stretched almost beyond recognition.

To effect the broad antifraud purposes to which they believed rule 10b–5 was directed, many courts liberally interpreted the policies of *Birnbaum* to include within its scope investors who had suffered injury from a securities fraud but who had not in fact been purchasers or sellers. The repeated modification, circumvention, and outright rejection of the *Birnbaum* rule by the lower courts clearly undermined its force and appeared to portend its demise.

Note, Standing Under Rule 10b–5 After *Blue Chip Stamps,* 75 *Mich.L.Rev.* 413, 414 (1976).

Commentators analyzing *Crane I* examined the impact of the case on the *Birnbaum* rule. One observed that

it is not clear whether the Second Circuit has abandoned its purchaser-seller requirement totally or whether it has done so only in the context of tender offers.

15 *Vill.L.Rev.* 1002, 1015 (1970).

Another opined that

*Crane* expands the anti-fraud provisions to an additional class of plaintiffs—those who are not purchasers or sellers directly engaged in a securities transaction. The

effect is not to decrease the burden of proof required to establish a violation of rule 10b–5, but rather to toll the death knell of the *Birnbaum* doctrine.

45 *Tul.L.Rev.* 188, 195 (1970).

In 1975, the Supreme Court clarified the purchaser-seller requirement of Rule 10b–5, by supporting the rule of *Birnbaum*. In *Blue Chip*, the Court held that only an actual purchaser or seller of securities could maintain a private action for damages under Rule 10b–5. The Court stated:

> Three principal classes of potential plaintiffs are presently barred by the *Birnbaum* rule. First are potential purchasers of shares, either in a new offering or on the Nation's post-distribution trading markets, who allege that they decided not to purchase because of an unduly gloomy representation or the omission of favorable material which made the issuer appear to be a less favorable investment vehicle than it actually was. Second are actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material. Third are shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5.

421 U.S. at 737–38, 95 S.Ct. at 1926.

*Blue Chip* suggests that the Air Brake shareholders who were deterred from tendering would have no cause of action; they fall most nearly into the second class of potential plaintiffs precluded by the *Birnbaum* rule. The reasoning of *Blue Chip* further suggests in three ways that Crane cannot recover.

First, the Air Brake shareholders were the primary victims of Standard's manipulation, they were the "hoodwinked investors." If they are unable to sue, it would seem anomalous to allow Crane to sue, since its injury is substantially derivative of theirs.

Secondly, Crane itself can be compared to the third class of potential plaintiffs barred by *Birnbaum*. Crane's investment in Air Brake was directed toward obtaining control. The value of its investment was obviously substantially diminished when its takeover effort failed and Standard's succeeded.

Finally, the rationale behind *Blue Chip* argues against recovery. One of the underlying policies of that case is the avoidance of difficult problems of proof of causation.

> [D]ealing in the security, whether by way of purchase or sale, will generally be an objectively demonstrable fact in an area of the law otherwise very much dependent upon oral testimony. In the absence of the *Birnbaum* doctrine, bystanders to the securities marketing process could await developments on the sidelines without risk, claiming that inaccuracies in disclosure caused nonselling in a falling market and that unduly pessimistic predictions by the issuer followed by a rising market caused them to allow retrospectively golden opportunities to pass.

421 U.S. at 747, 95 S.Ct. at 1931.

> Damage determination too is simplified. [A] putative plaintiff, who neither purchases nor sells securities but sues instead for intangible economic injury such as loss of a noncontractual opportunity to buy or sell, is more likely to be seeking a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis.

*Id.* at 734–35, 95 S.Ct. at 1925.

The problem of proof of causation and damages in the instant case is monumental. Crane is not even in the posture of a nonseller. Crane's recovery is dependent upon proof that certain persons who did not tender would have tendered but for Standard's acts and that their failure to tender damaged Crane.

At the 1976 trial, this Court focused on determining causation and damages. Standard took the position that its April 19 transactions did not cause the failure of Crane's offer. Standard's key witness was Leonard Sheriff, an experienced arbitrageur. Sheriff testified that the Crane offer

was defective in both form and substance. He stressed that due to the terms of the offer, most tendering decisions were made before April 19.

Standard argues that disclosure of its April 19 transactions would not have led Air Brake shareholders to tender to Crane. Instead, the information would have impressed the shareholders with Standard's determination to secure control and knowing that Standard was favored by Air Brake management, they would have waited for the merger.

Further, Crane's offer was extended until May 24. Any stockholder who was deterred from tendering could have tendered during the additional time period. In fact, 60.8%

of all shares tendered to Crane were tendered after April 19. But when the offer finally expired, Crane owned 32% of the outstanding stock.

In Sheriff's opinion, the Crane offer was simply not appealing to the Air Brake shareholders. Subordinated debentures of uncertain quality, they carried a risk that a capital gains tax would be owed by the tenderor. Further, the Air Brake management was strongly opposed to the Crane offer.

Crane presented two causation[4] experts, Raymond S. Troubh ("Troubh") and Peter A. Vlachos. Troubh emphasized that on April 19 there existed an attractive spread between the value of the Crane offer and

4. Crane argues that it is entitled to a presumption of causation, reasoning that the number of shares it would have garnered but for Standard's manipulation is a "classic imponderable," rendered uncertain by Standard's own acts. Therefore, plaintiff seeks to invoke the following learning from *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946):

> The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong had created.

Crane asks the Court to infer a connection between Standard's fraud and the failure of its tender offer.

Plaintiff submits that two lines of authority support its argument. One, which it dubs the *Mills-Chris-Craft* rule, establishes an irrebuttable presumption in cases of fraud upon a large group of stockholders. The other, the *Pennsylvania-Bigelow* rule, erects a rebuttable presumption of causation as a general axiom of damages.

As the Second Circuit has stated in *Simon v. New Haven Board & Carton Co.*, 516 F.2d 303, 306 (2d Cir.1975):

> The *Bigelow* rule that uncertainty as to the *amount* of damages is to be cast on a wrongdoer does not extend to uncertainty as to the *fact* of damages.

(Emphasis in original).

The causation question as to which Crane attempts to utilize the *Bigelow* rule is more closely akin to the issue of the *fact* of damages. The *Mills-Chris-Craft* rule was developed so that the "impracticalities [of proof in a case involving fraud on a substantial body of shareholders] are avoided by establishing a presumption of reliance where it is logical to presume that reliance in fact existed." *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 375 (2d Cir.1973), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148

(1973). The proof submitted by Crane makes this Court doubt that such a presumption is necessarily logical.

This Court's difficulty in making the inferential leap demanded by Crane is akin to the problem described in Justice Blackmun's concurrence in *Chris-Craft*:

> In the case of a suit by a tender offeror to recover damages suffered as a result of securities law violations by its competitors, causation is a far more complex issue. It is not enough for the offeror to prove that the competitor's violations caused the shareholders of the target corporation to act in a certain way. In addition, the offeror must show that the shareholders' reactions to the misstatements or omissions caused the injury for which it demands remuneration. Even though the *Mills-Affiliated Ute Citizens* presumption satisfies the requirements for proof of the first element of causation, the absence of any evidence that the violations might have altered the outcome of the contest for control would leave me unable to hold that the securities law violations caused the disappointed contestant's ultimate injury—its failure to acquire control of the target corporation.

430 U.S. at 51, 97 S.Ct. at 954.

Furthermore, the court in *Crane II* observed:

> Certainly it is not to be merely assumed that but for Standard's acts on April 19, 1968, Crane's tender offer would have succeeded and the merger would have failed.

490 F.2d at 344.

An effort to distinguish "assume" and "presume" in this context would amount to the sort of sophistry for which the courts are so often taken to task. If no assumption of causation exists, no presumption of causation exists.

Accordingly, this Court has not given Crane the benefit of any such presumption.

the market price of Air Brake stock. Also, if the offer succeeded, the non-tendering shareholder was threatened with a substantial "downside risk" that the value of his Air Brake stock would drop drastically. Further, on April 19, Crane's offer was "the only game in town."

Crane assails the testimony of Standard's expert Sheriff. Disputed is his opinion that Air Brake shareholders would have had to make up their minds about tendering before April 19. Crane further discredits his criticism of the substance of the Crane offer.

Standard's presentation on the causation question is more convincing than that of Crane. Much of the testimony and argument presented by Crane concerned the conduct of tender offers *in general*. Standard's witness, Sheriff, in his testimony and report focused on *this* tender offer. His analysis was predicated upon a breakdown of the Air Brake stockholders list and an examination of Crane's prospectus.

The Crane offer provided two optional methods for tendering. The shareholder could physically deliver his stock certificate, transmittal letter and proxy to the exchange or forwarding agent in New York or Los Angeles before 5 P.M. on April 19. Or, alternatively, he could make such physical deposit with a bank or broker who would then send a letter or telegram to the exchange or forwarding agent before the deadline. The letter or telegram would recite: 1) the name of the shareholder and the number of shares tendered; 2) the certificate numbers; 3) that the material had been deposited and had been or would be sent to the exchange or forwarding agent. The material so sent then had to be received within five business days.

It appears that anyone choosing to use the first method had to make his decision before April 19. This first method seems to have been preferred by Crane. It is set forth in large type on the front of the prospectus. In an April 5, 1968 letter to Air Brake shareholders and an announcement dated April 10, Crane urged that procedure. Their dealer-managers did the same in an April 8th letter to securities dealers.

Use of the alternative method could also not be a last minute venture. It demanded deposit with a bank or broker and confirmation that this had been done by letter or telegram. In a letter dated April 10, the exchange and forwarding agents were permitted to waive the deposit requirement, but the evidence did not demonstrate that this fact was made known to the public or to securities dealers. In fact, in an April 22nd letter to securities dealers the dealer-managers of the Crane offer announced that tenders could be made without proxies and without a declaration that the shares had been deposited. These modifications suggest a recognition that the original procedures may have contributed to Crane's failure on April 19.

In addition, there was testimony that brokers insisted upon receipt of tendering instructions and necessary papers at least 24 hours prior to the deadline due to back office problems.

Eleventh hour withdrawal of tenders would have encountered similar resistance. Further, Crane did not introduce evidence of withdrawals or attempted withdrawals.

Air Brake's opposition to Crane's offer undoubtedly had an influence upon the actions of Air Brake stockholders. *Cf.* Hayes & Taussig, Tactics of Cash Takeover Bids, 45 *Harv.Bus.Rev.* 135, 139 (1967). Crane's offer was conditional, subject to withdrawal.

Crane's offer was really not the only game in town. Standard's merger proposal was in the offing and had the support of Air Brake management.

Crane's subordinated debentures may have been unattractive. Standard's merger proposal offered preferred stock. Further, there was a possibility that the shareholder tendering to Crane would face a capital gains tax.

Had Standard's activities on April 19 discouraged large numbers of stockholders from tendering, it does seem curious that they did not come forward and tender during the extensions. Indeed, as noted above, the majority of tenders did occur after April 19, but were still not enough for Crane to succeed.

■ The causation question is incontestably a quagmire. Reams of argument and box after box of documentation on it and the damages issue were submitted to the Court. Having heard the arguments and testimony at trial, having read the briefs and having sifted through the exhibits, this Court finds itself unable to conclude that Crane has demonstrated that, "but for Standard's acts on April 19, 1968, Crane's tender offer would have succeeded and the merger would have failed." 490 F.2d at 344. The "chain of causation" is indeed "dubious."

### IV. Conclusion

The reasoning of *Chris-Craft* implies that Crane lacks standing to recover in this ac-

tion. This conclusion is buttressed by the trend toward a restrictive interpretation of the federal securities laws evidenced by the Supreme Court's recent decisions. As has been noted, the teachings of *Blue Chip* and the problems of proof in this case have contributed to the Court's decision.

■ Accordingly, this Court finds that Crane lacks standing to sue in this action. Furthermore, even assuming that Crane has standing, the Court finds that Crane failed to prove causation. Defendants Standard and Blyth [5] are entitled to judgment in their favor.

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.

Settle judgment on notice.

---

5. Blyth has been an unwilling participant throughout the history of this case. It has asserted that *Crane I* released it from liability and has argued a variety of grounds for its lack of culpability. Crane, on the other hand, has asserted that Blyth is a joint tort-feasor.

Judge Ryan's 1968 decision dismissed all claims against both Blyth and Standard. In structuring its appeal brief and setting forth the requisite "Issues Presented," Crane did `not press a manipulation claim against Blyth.

Not surprisingly, therefore, the Second Circuit in *Crane I* made only the briefest mention of Blyth which essentially involved only setting forth the history of the dispute rather than any discussion of liability. The Court of Appeals determination of culpability was lain at the doorstep of Standard, a fact which is only accentuated by Crane's insistence in its findings of fact in citing to *Crane I* yet substituting "defendants'" where the Court had said "Standard's."

Commentators have observed the omission.
   Although the court found violations by Standard, it did not make specific findings regarding the participation of Air Brake or the broker-dealer [Blyth] which effected the NYSE purchases for Standard.
E. Aranow & H. Einhorn, Tender Offers for Corporate Control, 240, n.71 (1973).
"[I]t is unfortunate that the *Crane [I]* court did not disclose the scope of the potential liability of Blyth & Co.," opined the author of a case note on that decision. 15 *Vill.L.Rev.* 1002, 1018 (1970).
The impact of *Crane I* on Blyth must be ascertained.
   [T]he rule is that a judgment of reversal is not necessarily an adjudication of the appellate court of any other than the questions in terms discussed and decided.

*Mutual Life Ins. Co. v. Hill*, 193 U.S. 551, 553–54, 24 S.Ct. 538, 539, 48 L.Ed. 788 (1904). *See Imperial Chemical Industries Ltd. v. National Distillers & Chem. Corp.*, 354 F.2d 459, 463 (2d Cir.1965).
In Crane I, the sole question "in terms discussed and decided" in favor of Crane was the market manipulation claim against Standard. Therefore, Judge Ryan's dismissal of the claims against Blyth, it can be reasoned, was left undisturbed.
Rather than leave Blyth in limbo, however, this Court determines that Blyth acted as Standard's investment banker and owes Crane no independent liability.
Under the mandates of the two previous Court of Appeals' decisions, this Court is free to fashion relief only from damage caused by the single act of wrongdoing pinpointed in *Crane I.* What was the nature and extent of Blyth's involvement in that wrongdoing?
The Court in *Crane I* specifically declined to determine whether, "[c]oncentrated open market bidding in a takeover battle," was unlawful. Violations of sections 9(a)(2) and 10(b) were found in "Standard's extraordinary buying . . . coupled with its large secret sales off the market . . . ." 419 F.2d at 793.
Blyth's role in buying Air Brake stock is not disputed. Blyth's involvement with the sales which form an indispensable half of the violation has not been established.
On *Chris-Craft's* first appearance in the Court of Appeals, the role of First Boston was discussed:
   The district court found, based on substantial evidence, that in its capacity as investment banker First Boston merely provided professional services to these companies. The business decisions that led to violations of

the securities laws were initiated by these companies, not by First Boston in its role as investment banker. We are aware of no authority for holding First Boston liable in that capacity.
Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 373, n.27 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231 (1973). Blyth too appears to have merely provided professional services.
The threat of an antitrust action, so emphasized by the Court of Appeals in its determination of standing in Crane I, was not made by Blyth.
Finally, the Court sitting in equity enjoys a certain discretion in apportioning liability among various defendants. See Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228, 241–242 (2d Cir.1974).
Therefore, even had this Court determined the standing and causation questions in favor of Crane and against Standard, Blyth would have been exonerated. Blyth shall bear its own attorneys' fees, however, since the Court does not believe Crane's claim to have been, "entirely without color and . . . asserted wantonly, for purposes of harassment or delay, or for other improper reasons." Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078 (2d Cir.1977). See also Van Alen v. Dominick & Dominick Inc., 560 F.2d 547 (2d Cir. 1977).