CRANE COMPANY, Plaintiff-Appellant,

v.

AMERICAN STANDARD, INC. and
Blyth & Co., Inc.,
Defendants-Appellees.

No. 4, Docket 77–7517.

United States Court of Appeals,
Second Circuit.

Argued Dec. 5, 1978.

Decided April 4, 1979.

Rehearing and Rehearing En Banc
Denied July 18, 1979.

John W. Castles, III, New York City (Lord, Day & Lord, Michael J. Murphy and Peter J. McKenna and Pomerantz, Levy, Haudek & Block, Abraham L. Pomerantz and William E. Haudek, New York City, of counsel), for plaintiff-appellant.

Edward W. Keane, New York City (Sullivan & Cromwell, David W. Peck, Robert M. Osgood and James E. Tyrrell, Jr., New York City, of counsel), for defendant-appellee American Standard, Inc.

Leonard A. Spivak, New York City (Cahill, Gordon & Reindel, Donald S. Parker and Helene Fromm, New York City, of counsel), for defendant-appellee Blyth & Co., Inc.

Before KAUFMAN, Chief Judge, and SMITH and VAN GRAAFEILAND, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from a judgment entered in the United States District Court for the Southern District of New York, Robert J. Ward, *Judge* (439 F.Supp. 945 (S.D.N.Y.1977)), in favor of defendants American Standard, Inc. ("Standard") and Blyth & Company ("Blyth"), in a securities action brought by Crane Company ("Crane") more than ten years ago. We affirm in part, reverse in part and remand.

This appeal, nine years after our decision in *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970) *("Crane I")*, and five years after our decision in *Crane Co. v. American Standard, Inc.*, 490 F.2d 332 (2d Cir. 1973) *("Crane II")*, follows the second trial on the merits in this action. Although the "Brobdingnagian procedural imbroglio," *Crane II, supra,* 490 F.2d at 334, which delayed this case for so long has been resolved, we are again confronted with the issue which faced us in *Crane I,* whether Crane has standing to bring this action under §§ 9(e) and 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. §§ 78i(e) and 78j(b). The district court held, contrary to our decision in *Crane I,* that Crane lacks standing. The district court further held that, assuming Crane does have standing, it failed to prove that the conduct of Standard and Blyth caused it any damage. It also held that it lacked jurisdiction of any pendent state law claims. Crane vigorously contests all aspects of the district court's decision. We find no error in the result on the claims based on federal securities law, but remand for further consideration of dismissal of the state law claims.

### The Takeover Battle

Although we shall assume familiarity with this court's opinions in *Crane I* and *Crane II,* exposition of the issues before us requires some restatement of the facts which brought this action to its present posture.

The controversy arose from a battle between Crane and Standard for control of Westinghouse Air Brake Company ("Air Brake"). Crane began making substantial purchases of Air Brake stock in 1967. Air Brake's management informed Crane that their company was not interested in the possibility of merger with Crane. Crane, however, continued to purchase stock on the open market. Air Brake responded by raising the cumulative vote necessary to obtain representation on its board of directors. In late 1967, Blyth, Standard's investment banker, offered Standard's assistance to Air Brake in fending off Crane's takeover efforts.

On February 20, 1978, when Air brake stock was selling on the New York Stock Exchange ("NYSE") at about $36 per share, Crane filed its 14–B statements with the SEC declaring its intention to solicit proxies

for the election of Air Brake directors. Shortly thereafter, Air Brake's directors approved a merger of Air Brake into Standard on the basis of an exchange of one share of Standard convertible preferred stock worth about $100 for every two shares of Air Brake stock. The merger required approval of a majority of the outstanding Air Brake shares in order to be effected. Air Brake stock rose to $44 on the NYSE after announcement of the merger agreement.

Crane countered by making a tender offer of subordinated debentures with face value of $50 for each share of Air Brake stock. This offer was to expire at 5:00 p. m. on April 19, 1968. Air Brake stock rose to about $49 on April 10, shortly after the tender offer was announced. By April 18, however, the stock price had fallen to about $45.

On April 19, the final day of Crane's original offer, Air Brake stock opened at $45.25. During the course of that day, Standard, acting through Blyth, purchased 82,400 shares [1] on the open market in cash transactions [2] at increasing prices up to $50, with an average price of $49.08 per share. But on that same day, Standard made an undisclosed, off-the-market sale of 100,000 shares to Investors Diversified Services, Inc. at $44.50 and a sale of 20,000 shares on the NYSE to Dillon, Read & Co., Inc. at $44.875.

Crane extended its tender offer several times, the last extension expiring on May 24, 1968. Its total holding of Air Brake stock, from the tender offer and its open market purchases, amounted to 1,480,623 shares, or 32.2% of Air Brake's outstanding stock.

Meanwhile, at a May 16 stockholders' meeting, 2,903,869 shares of Air Brake were voted in favor of the merger with Standard and 1,180,298 shares against. The affirmative vote was 602,290 shares more than the 2,301,579 shares which constituted a majority of the outstanding stock and which were needed to approve the merger. The merger became effective on June 7, 1968, at which time Crane's interest in Air Brake was converted into 740,311 shares of Standard convertible preferred stock. On June 13, under threat of an antitrust action to be brought by Standard,[3] Crane sold all but 10,000 of these preferred shares.[4]

### Crane I and II

On April 17, 1968, Crane brought suit claiming that Air Brake had made misrepresentations in its proxy statement soliciting votes in favor of the merger. On May 6, Crane filed a second action contending that Standard and Blyth had engaged in fraud and market manipulation in violation of §§ 9, 10 and 14 of the 1934 Act (15 U.S.C. §§ 78i, 78j and 78n), Rules 10b–5 and 10b–6 (17 C.F.R. §§ 240.10b–5 and 240.10b–6) and Regulation 14A (17 C.F.R. § 240.14a–1 et seq.). These actions, both of which sought equitable relief, were consolidated and tried before Judge Sylvester J. Ryan, who dismissed the consolidated complaint.

1. We stated in Crane I that Standard purchased 170,200 Air Brake shares on April 19. 419 F.2d 792. The discrepancy was due to an error in Standard's records which was brought to the district court's attention during the 1976 trial. This correction does not detract from our conclusion in Crane I that Standard engaged in manipulation of the market price of Air Brake stock. If anything, it strengthens the conclusion reached previously, for it demonstrates that Standard drove up the price of Air Brake stock on a day during which it was a net seller, rather than a net purchaser, of the stock.

2. The record date for determination of stockholders who would be entitled to vote on the proposed merger was April 23. Beginning April 17, the only way to obtain votable stock on the open market was to buy on a cash basis for same-day delivery rather than in a "regular-way" transaction in which payment and delivery were due five business days after the trade date.

3. Crane and Standard were major competitors in the plumbing industry.

4. This court held in American Standard, Inc. v. Crane Co., 510 F.2d 1043 (2d Cir. 1974), cert. denied, 421 U.S. 1000, 95 S.Ct. 2397, 44 L.Ed.2d 667 (1975), that Crane was not liable to Standard under § 16(b) of the 1934 Act, 15 U.S.C. § 78p(b), for the profit realized upon sale of these shares.

This court, in *Crane I,* affirmed part of Judge Ryan's judgment, but we reversed his dismissal of the fraud and market manipulation claims. We held that (1) Crane had standing to sue under §§ 9 and 10(b) of the 1934 Act; (2) Standard had violated § 9(a)(2)[5] by engaging in "massive buying [of Air Brake stock] on April 19, coupled with its concealed sales," 419 F.2d at 795, with the purpose and effect of "deter[ring] Air Brake shareholders from tendering to Crane," *id.,* thereby "inducing Crane to become a seller," *id.,* at 794, because of antitrust considerations; and (3) Standard had violated § 10(b)[6] and Rule 10b–5[7] by its failure to disclose its manipulative activities in connection with its transactions in Air Brake stock. We remanded the action to the district court, stating, "The manipulation *may* be found to have deprived Crane of success in its tender offer in the free market to which it was entitled . . . ." *Id.,* at 803–04 (emphasis added). We made clear, however, that "[t]he extent of the damage will have to be determined by the District Court, in fashioning an appropriate remedy, and the burden of proof thereon will be on Crane," *id.,* at 797, and that "Crane must establish that any relief sought is equitably required, considering the effect on other shareholders and the

diligence with which Crane sought to prevent consummation of the merger and to obtain delay in its implementation pending expeditious review of the denial of injunctive relief by the trial court." *Id.,* at 804.

On remand, Judge Ryan recused himself and the case was assigned to Judge Mansfield. When Judge Mansfield became a member of this court, the action was reassigned to Judge McLean. Upon his death, it was transferred to Judge Ward. Several orders of the district court, including one requiring Crane to amend its complaint and submit to trial before a jury in order to be entitled to an award of damages, were appealed to this court in 1973. We reversed that order in *Crane II, supra,* 490 F.2d 332, and reiterated the mandate of *Crane I* that "the determination of the amount of damages, if any, [was] to be made, as all other decisions in this equity action had been, by a district judge." *Id.,* at 341.

### Standing to Sue

#### A. *Decision on Remand*

The trial on remand took place before Judge Ward in April and May of 1976. Before the district court had rendered a decision, however, the Supreme Court an-

---

**5.** 15 U.S.C. § 78i provides, in relevant part:
    (a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

    .    .    .    .    .

    (2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

**6.** 15 U.S.C. § 78j provides, in relevant part:
    It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

    .    .    .    .    .

    (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or

any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**7.** 17 C.F.R. § 240.10b–5 provides:
    It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

    (1) to employ any device, scheme, or artifice to defraud,

    (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

nounced its opinion in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) *("Piper"),* in which it held that "a tender offeror, suing in its capacity as a takeover bidder, does not have standing to sue for damages under § 14(e)." *Id.,* at 42 n. 28, 97 S.Ct. at 949 n. 28. As a result, the district court concluded that the circumstances presented an exception to the general rule that "the lower court simply carries out a mandate as it is received without reexamination." 439 F.Supp. at 949. The district court therefore reconsidered the question of standing, previously decided in *Crane I,* in addition to the question whether Crane had demonstrated that it was entitled to any relief. After carefully considering the impact of *Piper,* the district court concluded that "[a]lthough the case is not directly analogous, the reasoning of *[Piper]* appears to preclude suit by Crane." *Id.,* at 951.

### B. *The Law of the Case*

■■■ Crane contends that the district court violated the doctrine of "the law of the case" when it reversed the holding of *Crane I* that Crane had standing to bring this action. It is clear, however, that regardless of the propriety of the district court's action,[8] *this* court is not bound by its own decision in the earlier appeal. As Judge Learned Hand wrote in *Higgins v. California Prune & Apricot Grower, Inc.,* 3 F.2d 896, 898 (2d Cir. 1924), "the 'law of the

case' does not rigidly bind a court to its former decisions, but is only addressed to its good sense." To be sure, under most circumstances it makes good sense to hold ourselves, for the remainder of a particular case, to the rulings made at an earlier stage of that case. Such a policy "saves judicial time" and eliminates the potential "unseemliness of a court's altering a legal ruling as to the same litigants, with the danger that this may reflect only a change in the membership of the tribunal . . . ." *Zdanok v. Glidden Co.,* 327 F.2d 944, 953 (2 Cir.), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). Where, however,

> before a case in a district court has proceeded to final judgment, a decision of the Supreme Court demonstrates that a ruling on which the judgment would depend was in error,. no principle of "the law of the case" would warrant a failure on our part to correct the ruling.

*Id.,* at 951 (footnote omitted).[9]

This admonition has particular force where the ruling in question involves the threshold determination of whether the plaintiff possesses a cause of action.[10] A conclusion that the plaintiff lacks standing to bring an action may further the goal of conserving judicial resources by eliminating the need for further proceedings on the merits. The possible "unseemliness" of an appearance of inconsistency in the particu-

---

**8.** This court said in *Crane II,* 490 F.2d at 341, "[I]t is fundamental that a district court must carry out the mandate of a court of appeals, even if the mandate was in error." *Cf. Higgins v. California Prune & Apricot Grower, Inc.,* 3 F.2d 896, 897 (2d Cir. 1924) (district court "rightly" declined to consider effect of subsequent Supreme Court decision upon mandate of court of appeals); *Rankin v. Atlantic Maritime Co.,* 117 F.Supp. 253 (S.D.N.Y.1953) (defendant obtained order of court of appeals granting leave to district court to consider effect of subsequently decided Supreme Court case).

**9.** The rationale for reconsideration of a prior ruling was stated clearly in *White v. Higgins,* 116 F.2d 312, 317 (1st Cir. 1940):

> Our law of the case is not the Supreme Court's law of the case. Our judgment on the second appeal stands or falls on its merits and has no improved standing before the

Supreme Court from the fact that it resulted from an application of our law of the case. This rationale applies with equal force even where, as here, the Supreme Court denied a petition for certiorari to review our first decision, since the Court remains free to consider issues decided in our original appeal should it later decide to review our ultimate disposition of the case. *See City of Indianapolis v. Chase National Bank,* 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47 (1941).

**10.** *Cf. Potomac Passengers Ass'n v. Chesapeake & Ohio Ry.,* 171 U.S.App.D.C. 359, 363 n. 22, 520 F.2d 91, 95 n. 22 (D.C.Cir.1975) (it is "problematic" whether "law of the case" doctrine applies to question of subject matter jurisdiction); *Denton v. Ellis,* 258 F.Supp. 223, 230 (E.D.N.Y.1966) (policy of getting a case finally adjudicated is of less weight when issue presented involves jurisdiction).

lar action is outweighed by the benefit which the judicial system derives from a clear and correct delineation of who may invoke the resources of that system. Such a delineation reduces the strain on the resources of the courts and thereby frees additional time to be devoted to those whose grievances are properly before us.

We conclude, after weighing these competing considerations, that we must reject in part the law of the case as set out in *Crane I* because our ruling that Crane possessed a cause of action for monetary damages under § 9(e), § 10(b) and Rule 10b–5 cannot be sustained in the aftermath of *Piper, supra,* 430 U.S. 1, 97 S.Ct. 926.

### C. *Section 10(b) and Rule 10b–5*

In *Piper,* the Supreme Court held that the plaintiff, "as a defeated tender offeror, has no implied cause of action for damages under § 14(e)" of the 1934 Act. *Id.,* at 42, 97 S.Ct., at 950. A number of factors compel the conclusion that the same result is required under § 10(b).

A comparison of the statutory provisions at issue here and in *Piper* suggests that Crane does not have standing. As this court previously has observed, the operative language of Rule 10b–5 and § 14(e) is substantially identical. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 362 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 945 (2d Cir. 1969). The primary difference is that Rule 10b–5 applies generally to activities " 'in connection with the purchase or sale of any security,' " whereas § 14(e) deals specifically with tender offers. *Id.,* at 945 n. 6. This difference suggests that we should be less willing to imply a cause of action for a defeated offeror under the general provisions of Rule 10b–5 than under § 14(e). We stated in *Crane I* that the addition to the 1934 Act of § 14(e) "should serve to resolve any doubts

about standing in the tender offer cases . . . ." 419 F.2d at 798–99. Although we were in error as to the way in which those doubts would be resolved, we adhere to our original belief that § 14(e) presented a stronger argument for standing than does Rule 10b–5.

Application of the analysis used by the Supreme Court in *Piper* also leads to the conclusion that Crane lacks standing under § 10(b) and Rule 10b–5. We look, as the Court did in *Piper,* to the statute itself to determine whether tender offerors have a cause of action for damages.[11] As the Court noted in *Piper,* 430 U.S. at 24, 97 S.Ct. at 941, "Section 14(e), like § 10(b), makes no provision whatever for a private cause of action . . . ." Nevertheless, it is now settled that a private cause of action under § 10(b) can sometimes be implied, *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), "in favor of the particular class intended to be protected by the statute." *Piper, supra,* 430 U.S. at 25, 97 S.Ct. at 941. Therefore, it is also appropriate to look to the legislative history of § 10(b) to determine whether "creation by judicial interpretation of the implied cause of action . . . is necessary to effectuate Congress' goals." *Id.,* at 26, 97 S.Ct., at 941. We find, however, less guidance from the history of § 10(b) than that provided in *Piper* by the history of § 14(e). Whereas the latter was replete with statements that the statute was intended to protect only stockholders confronted with a tender offer, *id.,* at 26–35, 97 S.Ct. 926, "the intended scope of § 10(b) . . . [is not] revealed explicitly in the legislative history of the 1934 Act, which deals primarily with other aspects of the legislation." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 202, 96 S.Ct. 1375, 1385 (1976). But what guidance we can glean from the history suggests that a defeated tender of-

---

11. Rule 10b–5 was adopted pursuant to authority granted under § 10(b). Therefore, the scope of the Rule and the authority to bring an action under it cannot exceed that allowed under the statute itself. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 212–14, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

feror would not have been among the intended beneficiaries of the provision.[12]

Senator Fletcher, Chairman of the Senate Committee on Banking and Currency, described the function of § 9(c) of S. 2693, which became § 10(b) of the 1934 Act, in the following terms:

> The Commission is also given power to forbid any other devices in connection with security transactions which it finds detrimental to the public interest or to *the proper protection of investors.*

78 Cong.Rec. 2271 (1934) (emphasis added). It might be suggested that the reference to activities "detrimental to the public interest" should be read to confer a private cause of action on every member of the public. Such an interpretation, however, would unjustifiably strain a provision whose authors did not expressly provide for *any* private cause of action. *See Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. at 729, 736, 95 S.Ct. 1917. The "public interest" is not a class of persons. It is simply a general goal which this statute, like most legislation, is meant to achieve. The phrase "proper protection of investors," however, clearly indicates "a particular class intended to be protected by the statute." This view of the purpose of § 10(b) comports with the Supreme Court's reference in *Ernst & Ernst, supra,* 425 U.S. at 198, 96 S.Ct. at 1383, to "the overall congressional purpose in the 1933 and 1934 Acts to protect investors against false and deceptive practices . . . ."[13]

It is clear that Crane does not come before this court as a defrauded investor seeking redress. Crane, as an investor in Air Brake, made a profit of about $10 million when it sold the Standard preferred stock which it received in the merger. Its grievance against Standard arises from actions which it contends prevented it, as a tender offeror, from acquiring control of Air Brake. In that role, Crane does not present itself to us as a member of the class intended to be protected by § 10(b) and Rule 10b–5.[13a] *Cf. Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795, 800 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973) (not every promissory note transaction within introductory clause of § 10 is within Rule 10b–5, because the 1934 Act "is for the protection of investors, and its provisions must be read accordingly"). Therefore, a private right of action cannot be implied in its favor. *Cf. Piper, supra,* 430 U.S. at 35, 97 S.Ct. 926 (plaintiff sought redress of injuries suffered as contestant for control rather than as stockholder of target corporation).

Policy considerations advanced in *Piper* to support the denial of a cause of action under § 14(e) likewise apply in an action under § 10(b) and Rule 10b–5. First, the threat of an action for damages by a defeated offeror will not "provide significant additional protection for [investors] in general." *Id.,* at 39–40, 97 S.Ct., at 948. The deterrent value of such actions is speculative. Furthermore, some investors "may be prejudiced because some tender offers will never be made if there is a possibility of massive damage claims. . . ." *Id.,* at 40, 97 S.Ct., at 948.

---

12. Although the tender offer is a relatively new phenomenon which was unknown at the time the 1934 Act was enacted, this fact is not dispositive of the question whether an offeror is a member of the class intended to be protected. In light of the Supreme Court's admonition that the securities acts should be read flexibly to effectuate their remedial purposes, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165 (1971); *J. I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), it is our task to determine whether tender offerors *would have been* among the intended beneficiaries of § 10(b) had the tender offer been in use in 1934.

13. To the extent that this view conflicts with that set forth in *A. T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir. 1967), we believe that our present statement properly reflects the impact of subsequent Supreme Court decisions.

13a. We think our conclusion does not preclude the result urged by the opinion of Timbers, *J.,* concurring and dissenting in *Adato v. Kagan,* 599 F.2d 1111 (2d Cir. 1979). In that case the loss was suffered by the plaintiffs as investors, regardless of investor intent at the time of purchase of the particular securities.

Second, to the extent that violations of § 10(b) involve wilful and deliberate misconduct [14] which might be more susceptible to a deterrent effect than was the conduct in *Piper,* the Court has stated that "injunctive relief at an earlier stage of the contest is apt to be the most efficacious form of remedy" for even "obvious and serious" violations involving "flagrant misconduct." *Id.,* at 40 n. 26, 97 S.Ct. 948 n. 26. Here, Crane unsuccessfully sought injunctive relief in the district court in 1968. It then chose not to seek a delay in implementation of the merger pending review of the denial of injunctive relief, but instead relied solely on the possibility of retrospective relief. Crane now must bear the consequences of its choice of litigation strategy.

Third, any damage award entered against Standard ultimately would be borne by its stockholders, among whom are undoubtedly some former stockholders of Air Brake who received Standard stock in the merger. It would be anomalous if they, who were misled by Standard's manipulation, were to be burdened with the cost of satisfying the damages allegedly suffered by Crane as a result of that manipulation. *Id.,* at 39, 97 S.Ct. 926.

One final factor supports our conclusion that *Piper* precludes a cause of action for Crane under § 10(b). In *Piper,* the Court said that the legislative history of § 14(e) "scarcely suggests an intent to confer highly important, *new* rights," *id.,* at 30, 97 S.Ct., at 943 (emphasis added), upon tender offerors. This characterization of an action for damages as a new right strongly implies that offerors did not possess such a cause of action under prior federal law, which included § 10(b) and Rule 10b–5.

■ For all of the foregoing reasons, we conclude that Crane did not have standing to sue for damages under § 10(b) and Rule 10b–5.[15]

### D. *Section 9(e)*

Unlike § 10(b), § 9(e) establishes an express cause of action for persons injured by violations of its provisions. 15 U.S.C. § 78i(e).[16] That cause of action exists in favor of "any person who shall purchase or sell any security at a price which was affected by such act or transaction . . . ."

The district court based its determination that Crane lacked standing under § 9(e) on the Supreme Court's discussion in *Piper* of the relationship of § 9 to Chris-Craft's claim under Rule 10b–6.[17] The Court noted there that § 9 focused upon "the amount actually paid by an investor for stock that had been the subject of manipulative activity." 430 U.S. at 46, 97 S.Ct. at 952. Because Chris-Craft did not claim to be a "hoodwinked investor" seeking recovery of "an improper premium" paid for Piper stock, the Court held that it had no claim under Rule 10b–6. *Id.* The district court here held that *Piper*

---

**14.** Our disposition of the standing issue makes it unnecessary to address the question whether Standard's misconduct satisfied the scienter requirement of *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375 (1976).

**15.** It might be suggested that *Piper* should be distinguished from this case because *Piper* involved a direct claim for monetary damages, 430 U.S. 9, 12–13, 97 S.Ct. 926, whereas Crane is pursuing an award of damages pursuant to the court's equitable power to award such relief "as the merits of the controversy may require." *Borak v. J. I. Case Co.,* 317 F.2d 838, 849 (7th Cir. 1963), *aff'd,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *see also, Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386–89, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Such a distinction is untenable. Although we adhere to our ruling in *Crane I* that Crane had standing to sue for injunctive relief, *see* p. 254 & n. 23,

*infra,* the reasons advanced in *Piper* to deny a cause of action directly for damages apply with equal force to an award of damages as an element of equitable relief.

**16.** 15 U.S.C. § 78i(e) provides in relevant part:

Any person who willfully participates in any act or transaction in violation of subsections (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction.

**17.** In *Piper,* the SEC suggested in its *amicus* brief that Rule 10b–6 was issued under authority derived from § 9(a)(6), as well as § 10(b).

mandated the same result for Crane's § 9 claim.

Although we agree that § 9, read in the light of *Piper,* does not provide a cause of action for Crane, we reach that conclusion by a path different from that followed by the district court. The factual circumstances present here and the legal claim advanced by Crane are not identical to those in *Piper.* The cause of action expressly established by § 9(e) runs in favor of both those who purchase *and sell* stock at a price affected by a manipulative transaction. In *Piper,* Chris-Craft in fact had not sold the Piper stock that it had purchased previously. Thus it was not necessary that the Court consider a seller's § 9 cause of action. Crane contended, however, and we held in *Crane I,* that "Standard's actions had the intended and inevitable effect of inducing Crane to become a seller within the meaning of section 9(a)(2) . . . ." 419 F.2d at 794. We must determine, therefore, whether Crane's forced sale occurred "at a price which was affected by" Standard's manipulative transactions, so as to bring Crane within the scope of the protection provided by § 9(e). In light of the Supreme Court's guidance in *Piper,* we conclude that Crane has not alleged and could not demonstrate that it satisfied this requirement.

The Supreme Court held in *Piper* that because Piper had not alleged that the price it paid for Bangor Punta stock was affected by the manipulative activity, it could not invoke the protection of the Act. Although the Court's discussion dealt only with the purchase of a stock, there is nothing in the statute to suggest that, in the case of a sale, we should concern ourselves with anything other than the price actually received for the stock sold.

Crane suggests that either of two transactions might be viewed as the sale of a security within the terms of § 9(e). The first is the exchange of Air Brake common stock for Standard preferred stock; the second is Crane's sale of the Standard preferred stock on the NYSE. Because we conclude that neither of these transactions took place at a price affected by Standard's manipulation of Air Brake common stock, we need not decide which, if either, could constitute a sale for the purposes of § 9(e).

The "price" at which Crane "sold" its Air Brake common stock was established by the terms of the merger agreement between Air Brake and Standard. This agreement was publicly announced on March 4, 1968, more than one month before Standard engaged in its manipulation of Air Brake common stock. The exchange terms of the merger were not amended thereafter. Crane received 740,311 shares of Standard preferred stock in exchange for its 1,480,623 shares of Air Brake common, in accordance with the terms announced on March 4. It is clear that the price at which Crane "sold" the Air Brake stock was not in any way affected by the manipulation which occurred after the terms of the exchange had been established.

Crane similarly has not alleged or established that the price at which it later sold the Standard preferred stock was in any way affected by the manipulation. Crane sold most of that stock on the NYSE on June 13, 1968 at a price of $104.25 per share, the equivalent of $52.125 per original share of Air Brake common. This was an ordinary open-market transaction, notable only for being, as of that date, the largest single transaction (in dollar volume) in the history of the NYSE. Crane has not suggested that the manipulation of Air Brake common in April, 1968 had any effect on the price at which Standard preferred sold in June, 1968, nor does the record contain proof of such effect.[18]

---

18. Thomas Mellon Evans, Chairman of the Board of Directors of Crane, did testify that Crane had chosen Blyth as its broker in the sale of the Standard preferred stock because

it was my personal opinion, and *I have no proof,* that Blyth was running a rigged mar-

ket in the stock, that is why we got them to sell our stock. . . . (Emphasis added.) This testimony does not assist Crane's position on this issue. First, Evans conceded that he had no proof of this allegation. Second, he did not attempt to connect this alleged "rigged market" to the earlier manipulation of Air

It might be argued that *any* price for the Standard preferred was in a sense an effect of the manipulation because without the manipulation (assuming, *arguendo*, that Crane had proved that manipulation caused the defeat of its offer) the merger would not have been approved and the preferred stock would never have been issued. But § 9 was not intended to deal with such a generalized complaint. Rather, Congress sought "to give to investors markets where prices may be established by the free and honest balancing of investment demand with investment supply." H.R.Rep.No. 1383, 73d Cong., 2d Sess. 10 (1934). Crane has not alleged that the market in Standard preferred was not such a free and honest market.

Crane's claim then is not that the prevailing price in the markets in which it bought [19] or sold a security was affected by any manipulative act or transaction. What it seeks to recover is the "control premium" [20] which would have accrued to it had it obtained sufficient Air Brake stock to block the merger and gain control of Air Brake. Crane's appellate brief argues, "the value of that control would have greatly exceeded the price Crane received for its minority position in Standard. . . ." Such a claim for the loss of an opportunity to control a target corporation is not within the ambit of the express civil remedy provided in § 9(e).[21]

In the light of *Piper,* we must conclude that the district court was correct in dismissing Crane's § 9(e) claim.

### Proof of Causation

We did not establish in *Crane I* a standard by which the district court was to determine the appropriate remedy for Standard's violations of § 9 and § 10(b). Although our opinion in *Crane II* might be read as approving a standard of "but for" causation, *see Crane II, supra,* 490 F.2d at 344, there are also circumstances in which proof of the materiality of a nondisclosure has been held sufficient to establish "the requisite element of causation in fact." *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472 (1972); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384–85, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra,* 480 F.2d at 373–77; *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167, 1172 (2d Cir. 1970). *But see Piper, supra,* 430 U.S. at 50–53, 97 S.Ct. 926 (Blackmun, J., concurring). Because of our disposition of the issue of standing, we need not decide whether the district court properly determined that Crane was not entitled to any relief on the § 9(e) and § 10(b) claims by reason of deficiency of proof of causation.

### *Pendent Jurisdiction of State Law Claims*

The district court dismissed "any claims [Crane] may have under state law," on the ground that "[w]hen the federal claim is dismissed, the jurisdictional peg on which the state cause of action could hang, is no longer present." 439 F.Supp. at 951 n. 2. Crane argues that in so doing the court abused the discretion which it possesses to determine whether to adjudicate state claims under principles of pendent jurisdiction. We reverse the dismissal of Crane's state law claims, not because the district court abused its discretion, but rather because it failed to exercise that discretion, apparently because of a mistaken belief

---

Brake common. Finally, even if Blyth was in fact running a rigged market in Standard preferred, it must be assumed that Crane expected to benefit from the existence of that market by its use of Blyth as its broker. Thus Crane would receive a higher, not lower, price for the stock that it sold.

**19.** Crane does not contend that it purchased Air Brake stock at an inflated price caused by Standard's manipulation.

**20.** *See generally, Newmark v. RKO General, Inc.,* 305 F.Supp. 310, 313–16 (S.D.N.Y.1969), *aff'd,* 425 F.2d 348, 357–58 (2d Cir.), *cert. denied,* 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970).

**21.** We do not hold that a defeated tender offeror may not invoke § 9(e) if it in fact buys or sells a security at a price affected by an act or transaction that violates § 9(a)(2). We hold only that Crane has not alleged or proved that it is such a plaintiff.

that it lacked the *power* to adjudicate any pending claims.[22]

■ The Supreme Court said in *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966):

> Pendent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim "arising under . . . the Laws of the United States . . .," U.S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. (Footnote and citations.) (Emphasis in original.)

Even where substantial time and resources have been expended in the trial of an action in federal court, pendent state claims must be dismissed if it later is determined that there never existed a federal claim sufficient to invoke the jurisdiction of the federal court. *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187 (3d Cir. 1976).

Such is not the case here. Although we hold that Crane did not have a federal cause of action for damages under § 9(e) or § 10(b) of the 1934 Act, we have found nothing in *Piper* or elsewhere that would lead us to alter our determination in *Crane I* that Crane did have standing to sue for injunctive relief.[23] Thus there existed a claim sufficient to confer jurisdiction of this action upon the district court. Furthermore, *Crane I* held that this claim for injunctive relief could survive a motion to dismiss. Therefore, the policy expressed in *Gibbs, supra,* 383 U.S. at 726, 86 S.Ct. at 1139, that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well," is not applicable here.

It is true that on remand after *Crane I* and *II,* Crane did not press its claim for injunctive relief, presumably because of the substantial time that had elapsed since the consummation of the merger. We believe, however, that this situation is analogous to that in *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), where the Court held that the mooting of a federal constitutional claim constituted a factor affecting the discretion, not the power, of the district court to adjudicate a pendent claim.

■ We therefore reverse the dismissal of Crane's claims under state law and remand the matter to the district court to determine, in the exercise of its discretion, see *Gibbs, supra,* 383 U.S. at 726–27, 86 S.Ct. 1130, whether it should adjudicate those claims.[24]

22. Although one of the two cases cited by the district court, *Girard v. 94th Street & Fifth Avenue Corp.,* 530 F.2d 66 (2d Cir.), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976), involved a *discretionary* dismissal of pendent state claims, we conclude from the district court's statement that the "jurisdictional peg" from which the state claim "could hang" was lacking, that the district court here relied on an absence of *power* to decide the state claim.

23. The Court expressly stated in *Piper* that it was not deciding whether a tender offeror could bring an action for injunctive relief under either § 14(e) or Rule 10b–6. 430 U.S. at 47, n. 33, 97 S.Ct. 926. The Court noted, however, that in cases of obvious and serious violations, "injunctive relief at an earlier stage of the contest is apt to be the most efficacious form of remedy." *Id.,* at 40 n. 26, 97 S.Ct., at 948 n. 26. The *Piper* opinion also quoted with approval, *id.,* at 42, 97 S.Ct., at 949, the language of Judge Friendly writing for this court in *Elec-*

*tronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 947 (2d Cir. 1969), that in corporate control contests the stage of preliminary relief " 'is the time when relief can best be given.' " In light of the heavy workload of the Securities and Exchange Commission, the tender offeror usually would be the party with the greatest motive and opportunity to seek such relief. *See* Pitt, *Standing to Sue Under the Williams Act After Chris-Craft: A Leaky Ship on Troubled Waters,* 34 Bus.Law. 117, 183–84 (1978).

Lower courts which have confronted the question since *Piper* have found standing under § 14(e) for a tender offeror to sue for injunctive relief. *See Weeks Dredging & Contracting, Inc. v. American Dredging Co.,* 451 F.Supp. 468 (E.D.Pa.1978); *Humana, Inc. v. American Medicorp, Inc.,* 445 F.Supp. 613 (S.D.N.Y.1977).

24. It is not apparent from the record exactly what state law claims Crane sought to have the district court decide upon remand. Crane's appellate brief contends that its claims included

**255**

### Attorneys' Fees

Crane suggests that it is entitled to an award of attorney's fees, at least through the time of our decision in *Crane II,* because it successfully demonstrated that Standard violated the 1934 Act. It relies on *Mills, supra,* 396 U.S. at 389–97, 90 S.Ct. 616, where the Supreme Court held that stockholders of a corporation who proved in a derivative and class action that the corporation had violated § 14 of the 1934 Act should be awarded attorneys' fees, even if it later were determined that no monetary recovery should be allowed.

■ *Mills* is inapposite to this action. The Court reasoned in *Mills* that the plaintiffs, by "vindicating the statutory policy" of "fair and informed corporate suffrage," had "rendered a substantial service to the corporation and its shareholders" and were entitled to have the expense of the litigation imposed "on the class that has benefited." *Id.,* at 396–97, 90 S.Ct. at 627–628. Here, Crane did not sue derivatively or on behalf of shareholders of either Air Brake or Standard. Standard's manipulation of Air Brake stock did not cause injury to anyone other than Crane itself. The shareholders of Standard, who would bear the cost of an award of attorneys' fees, received no benefit from this litigation, other than the incremental benefit which arguably accrues to all participants in the securities markets whenever violations of the securities laws are uncovered. Since this case does not involve the "special circumstances" or "overriding considerations" which would justify an award of attorneys' fees, *id.,* at 391, 90 S.Ct. 616, Crane's request is denied.[25]

"market manipulation as a common law fraud" and "the common law tort of interference with a prospective business relation or advantage," citing *Duane Jones Co. v. Burke,* 306 N.Y. 172, 117 N.E.2d 237 (1954). Crane's complaint, filed in 1968, invoked "principles of pendent jurisdiction" and alleged, *inter alia,* that "Crane is having its offer to purchase shares of Air Brake improperly interfered with" and that Standard was acting "in secret concert and conspiracy" with Air Brake and others to solicit proxies in violation of "common law."

The judgment is affirmed insofar as it dismissed the claims against both Standard and Blyth under § 9(e) and § 10(b) of the 1934 Act because Crane lacked standing to sue. The judgment is reversed as to the dismissal of the state law claims and remanded for further consideration in accordance with this opinion.

We intimate no view as to the validity of any of these claims. The district court, in exercising its discretion, should of course consider whether the plaintiff has alleged and preserved during this lengthy litigation whatever state law claims it now seeks to have decided.

25. Because we hold that Crane had no cause of action under § 9(e), it is of course not entitled to the award of attorneys' fees expressly authorized by that provision of the 1934 Act.